**STATE of Missouri, Respondent,**

v.

**Marion L. HOLLOWAY, Appellant.**

**No. KCD 30519.**

Missouri Court of Appeals,
Western District.

March 3, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 7, 1980.

Application to Transfer Denied
May 13, 1980.

Dennis J. C. Owens, Harold L. Holliday, Jr., Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before TURNAGE, P. J., and SHAN-GLER and MANFORD, JJ.

MANFORD, Judge.

This is a direct appeal from a jury conviction for the offense of kidnapping for ransom. Punishment was affixed at twenty years in the Missouri Department of Corrections. The judgment is affirmed.

One point is presented on appeal. This point alleges the trial court erred in refusing to grant a mistrial or new trial because appellant was surprised and hence unable to prepare an adequate defense by and as a result of the introduction of a second investigation report from the Federal Bureau of Investigation. This report resulted from an interview with the victim, and appellant was not provided a copy prior to trial, although the prosecution had assured appellant of full compliance with the rules of discovery. Appellant contends the prosecution's violation of Rule 25.32(A)(1) prejudiced his rights at trial.

The sufficiency of the evidence is not challenged, so only a brief recital of pertinent facts is necessary.

The victim testified that the appellant, whom she identified, gained entrance to her home upon his request to use her telephone because of car trouble. Appellant attempted to use the phone. The victim testified she overheard a busy signal. When appellant turned toward the victim, he pointed a gun at her and told her to lie on the floor. The victim was blindfolded and her hands were tied. Appellant and another unidentified man removed her from her home to a waiting vehicle. These events occurred at approximately 4:20 p. m. on December 23, 1977.

In further direct testimony, the victim stated she was transported by auto to an abandoned house. She recalled she was tied and forced to stay upon a bed in the house. She was released by her abductors at approximately 12:30 a. m. on December 25, 1977, upon payment of $25,000 ransom.

Upon cross-examination, the victim was asked, "Now Mrs. E____, during the time that you were in this house did you ever have sexual intercourse with Mr. Gene Ray Stout?" The victim answered, "He raped me if that is what you mean."

In further testimony, the victim testified as to the details of the rape. She testified she was threatened with the fact that if she did not disrobe, Stout would shoot her. She also testified that she was fearful of her safety and that she pled with Stout not to rape her because she had given birth to a stillborn child a short time before. However, she stated that Stout did rape her, led her to the bathroom following the rape, and upon her return from the bathroom, raped her again. Throughout this phase of the evidence, the victim repeatedly asserted that appellant never physically abused her in any manner. She further testified appellant was not present during the rape.

The victim was further cross-examined upon the question as to whom she had reported the rape and she answered to her husband, her mother and F.B.I. agents. The victim was then asked if, in fact, the first reference to any rape was disclosed during her deposition prior to trial, and she answered "No".

As the trial progressed, Michael Clapp, an agent for the F.B.I., produced a report which he had compiled from an interview with the victim. This report contained reference to the rape. The agent testified this report had never been provided the prosecutor. The evidence revealed two reports had been compiled by the F.B.I. The first report, which contained no reference to the rape, was forwarded to the prosecutor and was made available to appellant. The second report, which included reference to the rape, remained with the F.B.I. The reason the second report had not been forwarded was that the victim did not want the rape incident made public.

At this juncture, appellant requested and was granted a recess. A conference between the prosecutor, defense counsel and the court was held. This conference established that the prosecutor had no actual knowledge or possession of the so-called second report. During this same conference, appellant made it known his intentions to impeach the victim's testimony. Appellant moved for a mistrial, which was denied. Appellant then advised the court he would be satisfied if permitted to explain the matter to the jury. A copy of the report was made available to appellant and he was permitted to review it during the overnight recess. Upon returning to court the following day, appellant moved again for a mistrial. This request was denied.

As the trial progressed further, the victim returned to the witness stand for the purpose of identifying voices of taped telephone conversations.

When appellant was permitted to further cross-examine the victim, he proceeded to inquire about matters other than those upon the further redirect testimony. Over objection, the appellant was permitted to further inquire of the victim, as the trial court ruled appellant could cross-examine the victim "on any matter that has come into evidence".

This ruling unleashed a line of questioning by appellant relative to the rape incident. Appellant attacked the victim's testimony upon prior inconsistent statements by use of her deposition. The pertinent portion of the record is as follows:

"Q. (By Mr. Adelman, attorney for Holloway) Now, I will turn to page thirty-nine. Now, there's been also some statements made about your having reported this to others, that is this attempted rape that you made a report of to Officer Agent Clapp?

A. Yes.

Q. Now, I will ask you if these questions were not given and these answers given. Page thirty-nine, Your Honor. 'Were your legs'— starting, question five: 'Were your legs tied also? Answer: No, they weren't." Question: Your hands tied to the bed or tied together? Answer: Tied to the bed. Question: How was that done? Answer: Tied back onto the headboards, yes. Question: —now, listen to this closely, And did you mention this to any of the other men? Did you complain to anyone at all before talking about this? Answer: No, I did not.'

A. Yes, sir.

Q. Did you give this answer to that question?

A. Yes, and it was because I thought you were talking to me about Robb, Stout and Holloway, not any F.B.I. agent or any other—or my mother or my husband.

Q. Are you denying that that answer you gave that, no, I did not talk to anyone else, had to do with this alleged assault on you?

A. I don't understand what you're saying.

Q. These questions and answers—

A. I know the questions, now what are you saying? What are you saying that I'm saying, no, that I told you that I didn't talk to anyone about it?

Q. That's basically what you answered here.

A. When you asked me the question I understood that you were talking about the persons that were at the house that had been talked—and that's what I answered you by.

Q. Let me repeat the question again.

A. Okay.

Q. The last part of that question, 'Did you complain to anyone at all before your talking about this,' that's the question about—you're talking about. This answer, 'No, I did not.'

A. I can hear you and I'm sorry I must misunderstand you because—

Q. Did you give that—

MR. MARSHALL: (prosecuting attorney) Objection—

THE COURT: Mr. Adelman, you know better than that.

MR. ADELMAN: No, Your Honor, I do not.

THE COURT: Well, sit down and allow this witness to explain anything about her answer without being interrupted. It's argumentative and it's not polite.

MR. ADELMAN: Your Honor, I have asked if she gave an answer to a ques-

tion. After she has given the answer she has a right to explain.

THE COURT: Mr. Adelman, I can hear everything that is being said, thank you. Now, would you care to fininsh [sic] your explanation?

THE WITNESS: Yes, I would. When he asked me the question I understood him to mean the people that had abducted me from my home. I did not know that he was talking about my—any law enforcement officials, anyone in my family or anyone else.

Q. (By Mr. Adelman) One other question, How do you interpret complain to anyone at all?

MR. MARSHALL: Objection, Your Honor. She's answered the question. That's four or five times—

THE COURT: Sustained.

MR. ADELMAN: Nothing further, Your Honor. I think that's all."

■ It is evident that appellant was afforded the opportunity and did in fact seize upon the opportunity to impeach the testimony of the victim. Appellant, upon this appeal, argues for reversal and new trial upon the basis of the prosecution's failure to comply with Rule 25.32. It is assumed without deciding that appellant's contention is in all respects correct, but he is afforded no relief on this appeal because the record of this trial reflects appellant suffered no prejudice upon trial.

■ As regards Rule 25.32, its purpose, intent and, of course, any violation thereof, the basic question is whether or not the failure to comply with it results in fundamental unfairness to an accused, see *State v. Moten*, 542 S.W.2d 317 (Mo.App.1976). "Whether prejudice results in a given case depends upon the nature of the charge, the evidence presented by the State, and the role the undisclosed testimony would likely have played." *State v. Dayton*, 535 S.W.2d 469, 478 (Mo.App.1976). Where two reports were made known and the contents of one report played no role in the defense of the accused, see *State v. Friend*, 570 S.W.2d 817 (Mo.App.1978).

The charge against appellant was kidnapping for ransom. There was no charge or allegation of rape against him. The entire issue of the rape was to attack the credibility of the victim's testimony for prior inconsistent statements.

The production of the second report was just more of the same form of evidence as regarded the incident of rape. It is to be noted appellant solicited the evidence upon the act of rape. He was afforded full opportunity and did attack the credibility on prior inconsistent statements by the victim. In addition to the full opportunity to impeach the victim as regards the rape, appellant was presented in more favorable light before the jury because the victim testified that although appellant was, without doubt, one of her abductors, he never physically abused her. This is shown by the following testimony:

"Q. (By Mr. Adelman) Mrs. E——, isn't it a fact that the first time any evidence or information came out about this alleged rape was when I faced you with it on your deposition?

A. No, it is not.

Q. Did anybody else other than the alleged Mr. Clapp know this alleged rape?

A. My husband and my mother and I believe maybe a couple of other F.B.I. agents knew about it, but I gave a full report to someone.

Q. You gave Mr. Clapp a full report?

A. Yes, I did.

Q. During all of this alleged rape where was Mr. Holloway?

A. I don't know.

Q. Was he in the house?

A. I don't have any idea. I don't believe so.

Q. You don't think he was?

A. No, I don't.

Q. I want to ask you this: During the entire encounter what was Mr. Holloway's treatment of you?

A. He was relatively good to me. He seemed like he was more concerned about my well-being than anyone else. He gave me a Kleenex at one time because he said it sounded like my head was stopped up. He did not harm me in any way.

Q. Throughout this entire escapade did Mr. Holloway do anything to injure you or did he touch you in any way other than of course with the alleged blindfold or did he do anything to injure you or cause you any personal apprehension?

A. No, he did not.

Q. Was he solicitous of your welfare and looked after your well-being?

A. To a certain extent.

Q. Yes, do sepak [sic] up, please.

A. To a certain extent, yes.

Q. Did Mr. Holloway ever say anything or Luke ever say anything which puts you in fear of your life excepting at first when this gun was pointed at you?

A. Okay. They were—when they came back with the money, Luke and Stout were talking and I couldn't hear what they said but Stout said, 'We're not going to kill her.' I don't know, I suppose he was talking to Luke, I'm not for sure."

In summary, appellant had deposed the victim long before the trial. She had testified to being raped. Appellant, and not the prosecution, broached the subject of the rape upon the first cross-examination of the victim. The second report, at best, was mere cumulative evidence upon the rape, and thus went further toward the impeachment of the victim's testimony. The obvious purpose of this entire area of inquiry was to attack the credibility of the victim's testimony by prior inconsistent statements. Appellant was afforded every opportunity to impeach the victim's testimony.

The evidence upon this record shows no prejudice toward appellant resulted upon trial, and the trial court's refusal to grant a mistrial under the facts of this case was not

error. Under the rules of *State v. Moten, supra, State v. Dayton, supra* and *State v. Friend, supra,* the relief sought on this appeal is denied.

The judgment of the trial court is in all respects affirmed.

All concur.